UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIAM G. HUDSON, JUSTIN R. JORDAN, and OLIVER J. BROWN, | § § § § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-05-CV-03297 |
| | § | |
| BOARD OF REGENTS OF TEXAS SOUTHERN UNIVERSITY, ET AL., | § § § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion for a Judgment as a Matter of Law (Doc. No. 129) and Supplemental Brief in Support of Motion for Judgment as a Matter of Law (Doc. No. 170). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendants' Motion should be granted in part and denied in part as to the punitive damages award.

## I.   PROCEDURAL BACKGROUND

The Court conducted a jury trial on this matter from July 21, 2008 to August 1, 2008.[1] On August 1, 2008, the jury found that Defendants Wiggins and Marshall had violated Plaintiff Brown's First Amendment rights in retaliation for protected constitutional activity, that Defendants Wiggins, Marshall, Falls and Ford violated Plaintiff Hudson's First Amendment rights in retaliation for protected constitutional activity, that Wiggins, Falls, and Ford maliciously prosecuted Hudson and Plaintiff Jordan, and that Wiggins, Falls, and Ford falsely arrested Hudson and Jordan. (Doc. No.

---

[1] The facts of this case are described in the Court's previous orders on this matter. The Court will include relevant background facts where they are necessary.

121.) The jury awarded Brown $65,000 for violation of his First Amendment claims, for which Wiggins and Marshall were found jointly liable. (*Id.*) The jury further awarded Hudson $35,000 for violation of his First Amendment rights, for which Wiggins, Falls, Ford, and Marshall were found jointly liable. Finally, the jury awarded Hudson $40,000 in compensation for his malicious prosecution and false arrest, for which Wiggins, Falls, and Ford were jointly liable, and Jordan $50,000 for his malicious prosecution and false arrest, for which Wiggins, Falls and Ford were also jointly liable. (*Id.*)

On August 4, 2008, the Court held a status conference to discuss the second phase of the trial which would cover punitive damages. The parties were informed that this stage of the trial would not include the introduction of new evidence. Following this hearing, Defendants filed Objections to the Bifurcated Phase of the Trial on Exemplary Damages and a Motion for Continuance (Doc. No. 123), Objections to the Release of a Juror (Doc. No. 130), Objections to the Court's Proposed Charge (Doc. No. 128), and a Motion for a Judgment as a Matter of Law (Doc. No. 129).

On August 7, 2008, the Court held a second proceeding to address punitive damages. Prior to hearing argument, the Court ruled on Defendants' objections as well as issues raised in their Motion for Judgment as a Matter of Law. (Tr., vol. XI, 3:1-7:22, Aug. 7, 2008.) Eleven of the twelve original jurors adjudicated the punitive damages. After listening to a punitive damages instruction from the Court (Doc. No. 131), as well as argument from the attorneys, the jury returned a verdict for punitive damages against all Defendants.[2] Specifically, the jury found that Wiggins and Marshall should each pay Brown $50,000 for violation of his First Amendment rights and that Wiggins, Marshall,

---

[2] As will be discussed *infra*, the Court excused one juror from the punitive damages phase of the trial after she informed the Court that she had a previously arranged vacation that could not be easily rescheduled.

Falls and Ford each pay Hudson $25,000 for violation of his First Amendment rights. The jury further found that Falls, Ford, and Wiggins should each pay Hudson $25,000 for malicious prosecution and false arrest, and that they should each pay Jordan $25,000 for malicious prosecution and false arrest. (*Id.*)

Following the parties' attempt to settle the case, and the Court's efforts to retry one of Jordan's claims which was ultimately withdrawn, Defendants filed a Supplemental Brief in Support of their Motion for Judgment as to Exemplary Damages. (Doc. No. 170.) The Court now considers the issues raised in the Supplemental Brief.

## II.   ANALYSIS

### A. Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, a court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." FED. R. CIV. P. 50(a). The movant must specify the judgment sought and the law and facts that entitle it to the judgment. *Decorte v. Jordan*, 497 F.3d 433, 438 (5th Cir. 2007) (citing Fed. R. Civ. P. 50(a)(2)). "No later than ten days after the entry of judgment ... the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b).[3] "A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."

---

[3] Defendants filed a Motion for New Trial (Doc. No. 193) which the Court denied on April 14, 2009. (Doc. No. 201.)

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 398 n. 1 (2006) (quoting Amendments to Federal Rules of Civil Procedure, 134 F.R.D. 525, 687 (1991)).    In reviewing the sufficiency of the evidence to support a jury verdict in a civil action, the court must affirm unless "there is no legally sufficient evidentiary basis" for the jury's verdict. *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001) (citing FED. R. CIV. P. 50(a)); *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001)). The evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict. *Id.*

Defendants' Motion for Judgment as a Matter of Law ("Rule 50(a) Motion") (Doc. No. 129) was advanced after the evidence was submitted to the jury, and it returned findings of liability and compensatory damages; however, it was submitted before the jury heard argument and was charged on punitive damages.   The Court denied this Motion before it instructed the jury as to punitive damages.   The Court therefore considers the Supplemental Brief in Support of Motion for Judgment as a Matter of Law actually to be a renewed motion for judgment as a matter of law pursuant to Rule 50(b) ("Rule 50(b) Motion").

### B. Waiver

Plaintiffs argue that many of the arguments advanced in Defendants' Supplemental Brief have been waived because Defendants did not raise them in their pre-verdict Motion for Judgment as Matter of Law.   In support of this argument, Plaintiffs include the trial transcript following the first part of the bifurcated trial, in which Defendants raised a number of issues, but not the issues presented in its Supplemental Brief.   However, as discussed above, Defendants advanced the Rule 50(a) Motion before

the issue of punitive damages was submitted to the jury.   (Doc. No. 129.)   While Defendants' second motion was made after the liability phase of the trial was completed, it was advanced before the punitive damages phase.   At the time Defendants submitted this second motion, the Court had not yet informed the parties that they could not present evidence during the punitive phase.   For this reason, the Court will consider this second motion to have been timely made.   It contained most, but not all, of the arguments later presented in the Rule 50(b) Motion. The Court will note the omitted arguments below.

### C. Plaintiffs' Predicate Finding of Malice or Gross Negligence to Support State Law Claims

Defendants first allege that Plaintiffs failed to obtain a predicate finding of malice, gross negligence, or fraud, as required by Texas law.   Absent a jury finding based on clear and convincing evidence of malice, gross negligence or fraud, exemplary damages may not be awarded. *Munoz v. State Farm Lloyds of Texas*, 522 F.3d 568, 574 (5th Cir. 2008).   Defendants argue that Plaintiffs failed to submit and obtain a jury finding of malice, fraud, or gross negligence for each Defendant.   First, Defendants contend that the jury's finding of malicious prosecution against Defendants is based on a preponderance of evidence standard, not clear and convincing evidence, because the jury instructions for the initial phase of the trial contained no instructions on clear and convincing evidence.   Second, Defendants argue that the Court's instruction on the definition of "malice" was incorrect.

These arguments, however, are unconvincing.   Defendants offer no basis for their argument that the verdict was based on a preponderance of evidence except to say that the liability phase instructions contained no definition of "clear and convincing."   The instructions for the punitive phase, however, directed the jurors that they could only

5

award exemplary damages "if the Plaintiffs have proved by clear and convincing evidence that the harm they suffered resulted from malice or gross negligence." The instructions then defined "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[4]   (Doc. No. 131 at 9.)

To the extent Defendants argue that the Court gave an erroneous instruction on the burden of proof for the malicious prosecution claim in the liability phase, this argument is waived because it was not raised in Defendants' Rule 50(a) Motion before the evidence was submitted to the jury. Defendants argue that the definition of malice used in the liability phase instruction was incorrect because it did not define malice as the "specific intent to cause harm." At the punitive phase, however, the Court instructed the jury that "malice" was "defined as a specific intent to cause substantial injury of harm to the plaintiff." (*Id.*)

Finally, Defendants argue that the Court's instruction on punitive damages is insufficient because it did not contain either separate liability questions requiring the jury to assign liability to each Defendant on the basis of their malice or gross negligence or an instruction that the jurors must be unanimous in their finding of malice or gross negligence against each Defendant before proceeding to a dollar amount. The instructions, however, informed the jurors that their finding of exemplary damages must be unanimous, and it required them to list, for each claim, separate amounts for each

---

[4] The Court did make an error when reading the instructions and inadvertently instructed the jury that the standard of proof was both a preponderance of evidence and clear and convincing evidence. (Tr., vol. XI, 19:1-12 and 22:14-18.) Defendants objected, and the Court corrected itself, informing the jury that the burden of proof was clear and convincing evidence and that it was "a higher standard than preponderance of the evidence." (*Id.* at 27:3-15.)

defendant. Further, this argument was not advanced in Defendants' Rule 50(a) Motion; it is therefore waived.

### D. Confusion Regarding Indemnity

Defendants next argue that the Court erred by failing to include in its Supplemental Jury Instruction (Doc. No. 117) an instruction that state employees sued in their individual capacity would not be indemnified for acts committed in bad faith or with conscious disregard and that the state places a cap on indemnity up to an aggregate of $300,000 per occurrence, regardless of the number of claimants or separate acts or omissions. This argument, however, was omitted from Defendants' Rule 50(a) Motion; therefore, the Court cannot consider it post-verdict.   Assuming, however, that the argument had not been waived, the Court does not believe it has merit. The supplemental instructions informed the jurors that the state has "no obligation to indemnify any Defendants for damages" but that, if the acts were done in the course and scope of the Defendant's office or employment, the state "may indemnify the Defendant. None of us can accurately predict whether indemnification will be available." This instruction was given to the jury before the liability stage of the trial. They were not further instructed on indemnity before the punitive phase, and Defendants did not raise such an objection to the punitive instructions.[5]   Furthermore, Defendants' argument that the punitive instruction implied that the University, and not the individual Defendants, would be liable for punitive damages was not advanced either in Defendants' Rule 50(a) Motion or as an objection and is therefore waived.

---

[5] Defendants' did argue that the Court should include the Defendants' net worth as an element to be considered in the punitive phase, and they also argued that Section104.001 of the Texas Civil Practice and Remedies Code did not include punitive damages as subject to indemnification by the state. (Doc. No. 128 ¶ 6.) These arguments were advanced as objections, not in the Rule 50(a) Motion.  Further, the objections make no reference to the "bad faith" element or the statutory cap.

### E.  Evidence of Net Worth

Defendants next argue that the Court should have allowed them to present evidence of their net worth in the punitive stage.  In support of this argument, Defendants cite a provision of the Texas Code which lists factors that the trier of fact shall consider when deciding exemplary damages, including the net worth of the defendant.  TEX. CIV. PRAC. & REM. C. § 41.011(a)(6).[6]  The statute further mandates that "evidence that is relevant only to the amount of exemplary damages that may be awarded is not admissible during the first phase of a bifurcated trial."  TEX. CIV. PRAC. & REM. C. § 41.011(b).  While the punitive phase jury instructions provided that the jury could consider the financial resources of the defendants, there was no evidence presented to the jury of the individual Defendants' financial resources.  In his closing argument, Defendants' counsel told the jury that, even though they did not have any evidence of Defendants' net worth, they should still consider it in making their decision.  Defendants argue that the jury must have logically concluded that they were to consider the resources of the state and the University in assessing punitive damages.  Defendants therefore ask that the punitive damages be remitted.

Texas courts have found that "[n]othing in chapter 41 of the Texas Civil Practice and Remedies Code ... or other Texas case law indicates that evidence of the defendant's net worth is a necessary element for the plaintiff to recover any exemplary damages." *Durban v. Guajardo*, 79 S.W.3d 198, 210-211 (Tex. App.—Dallas 2002).  In *Durban*, the Texas Court of Appeals upheld the exemplary damages award even though the trial court had denied the defendant's request to introduce evidence of his net worth.  The court found that, if the award was an enormous penalty to the defendant, who had been found

---

[6] This provision, of course, applies only to Plaintiffs' state law claims.

guilty of assault, then it was deserved, and if the award was a mere annoyance, then the lack of evidence of his net worth benefited him rather than harmed him. *Id.* at 211. *See also Rangel v. Robinson*, 2007 WL 625042, at *7 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that plaintiffs are not required to produce evidence of the defendant's net worth in order to recover punitive damages and that the trial court could have reasonably concluded that the lack of evidence on the defendant's ability to pay the damages was outweighed by the enormity of his indifference and the public's need to stop drunk drivers).

In the instant case, while the jury did not have evidence of Defendants' net worth, they were familiar with the educational and occupational background of each Defendant, as well as Defendants' current employment status. The jury could have reasonably determined that their lack of knowledge of Defendants' net worth was outweighed by the public's interest in protecting the constitutional rights of university students. Moreover, the parties knew before the presentation of any evidence that the liability and punitive damages phase of the trial would be bifurcated. Even assuming the parties did not know the trial would be bifurcated, Defendants had ample opportunity to present evidence of net worth in the liability phase of the trial but never sought any assurance that such evidence could be presented in a second phase.

### F. Defendants' Qualified Immunity

Defendants, citing the law-of-the-case doctrine, argue that this Court's finding that Ford, Marshall, and Falls were entitled to qualified immunity for Plaintiff Hudson and Jordan's § 1983 claims should be extended to Plaintiffs' state law claims. The law of the case doctrine directs courts to refrain from revisiting issues that were resolved earlier

in the litigation. In civil cases, a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not final and lack res judicata effect. *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997) (citing *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *overruled on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.14 (5th Cir. 1994)).

The Court reached its conclusion that Defendants had qualified immunity on the § 1983 claims in its summary judgment order dated July 14, 2008. (Doc No. 88.) In the same order, it found that additional briefing was required to resolve Plaintiffs' state law claims. Plaintiffs later filed additional briefing alleging that Defendant Ford's sworn affidavit submitted to the district attorney was incomplete; therefore, it must have been made in bad faith. (Doc. No. 110.) When the jury determined that Defendants were not entitled to qualified immunity on Plaintiffs' state law claims, it had the benefit of live testimony, including that of Ranger Presley, who investigated whether Defendants had fraudulently filed charges against Plaintiff. Because the jury had the benefit of live testimony and more evidence on the reasonableness of Defendants' actions, the Court will not disturb their holding that Defendants were not entitled to qualified immunity for Plaintiffs' state law claims.

### G.  Evidence Supporting Punitive Damages Award

Defendants also argue that there is no legally sufficient evidence to support the award of punitive damages. Defendants cite *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and argue that the case contains none of the indicia of reprehensibility that warrant punitive damages: violence, deceit, malice or repeated misconduct.

Defendants contend that the harm to Plaintiffs, with respect to their First Amendment claims, was limited to temporary probation for Brown and a one-year suspension for Hudson. None of the Defendants was part of the Student Faculty Disciplinary Committee ("the Committee") that imposed the punishments. Further, Defendants argue that they proved that the Committee would have taken the same action against Plaintiffs because of their non-protected activities. As to Plaintiffs' state law claims of false arrest and malicious prosecution, Defendants argue that there is no evidence of deceit on their part in connection with the investigation that led to charges being filed, no evidence that any of the Plaintiffs was subjected to violence or physical contact of any kind, and no evidence of misconduct on the part of Defendants.[7]

### 1. State Law Claims

Next, Defendants turn to the investigation of the Boney Flyer, which led to the false arrest and malicious prosecution of Hudson and Jordan. To warrant exemplary damages, Plaintiffs are required to prove, by clear and convincing evidence, that Defendants acted with either fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE. ANN. § 41.003(a)(2). Malice is defined to mean a specific intent by the defendant to cause substantial injury or harm to the claimant. *Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.*, 223 S.W.3d 1, 22 (Tex.App.—El Paso 2005, no pet.) (citing TEX. CIV. PRAC. AND REM. CODE ANN. § 41.001(7)). Specific intent means that the actor desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it. *Id.* (citing *Reed Tool Co. v. Copelin,* 689 S.W.2d

---

[7] The Court notes that Defendants have challenged the evidentiary basis for punitive damages, not the actual amounts that the jury awarded.

404, 406 (Tex. 1985)). Plaintiffs may prove malice though either direct or circumstantial evidence. *Id.* (citations omitted).

As with Plaintiffs' federal claims, when reviewing the evidence for the legal sufficiency of Plaintiffs' state law claims under the clear and convincing standard, the Court must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *Southwestern Bell Telephone Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004) (citing Tex.Civ.Prac. & Rem. Code Ann. § 41.001(2)). In *Garza*, the Texas Supreme Court outlined the procedure for conducting a "no evidence" review under the clear and convincing standard:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*Garza*, 164 S.W.3d at 627 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

Defendants argue that *Dillard Dept. Stores v. Silva*, 148 S.W.3d 370, 374 (Tex. 2004), supports their position because the Texas Supreme Court found that there was insufficient evidence to support punitive damages when the defendants had detained the plaintiff on suspicion of shoplifting. The plaintiff was arrested and prosecuted for

shoplifting when a security guard found three shirts in his shopping bag that he intended to return. When the plaintiff was unable to produce a receipt, he was arrested. The Texas Supreme Court found that, while the plaintiff had been falsely arrested, there was no evidence of malice on the part of the department or that the plaintiff was exposed to an extreme risk of substantial harm. *Id.* at 373-374.

The Court finds that *Silva* is distinguishable. The Texas Supreme Court applied the pre-2003 definition of malice, which had two prongs. The first defined malice as "a specific intent by the defendant to cause substantial injury or harm to the claimant," which is identical to the current definition of malice. *Silva*, 148 S.W.3d at 373; *see also* TEX. CIV. PRAC. & REM. CODE. § 41.001(7). The second prong, which has since been recodified as the definition of gross negligence, was "an act or omission which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others and, of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." *Silva*, 148 S.W.3d at 373; *see also* TEX. CIV. PRAC. & REM. CODE. § 41.001(11). In *Silva*, the plaintiff did not allege that the defendant had acted with specific intent to cause him substantial harm; therefore, the Texas Supreme Court only considered whether the defendants had acted with malice as defined by the second prong, which contains the modern gross negligence standard. In the instant case, Plaintiffs claimed that Defendants had acted with a specific intent to cause harm. Further, the jury was instructed that they could based an award of exemplary damages on a finding of either malice or gross negligence—a different standard from the one at issue in *Silva*.

In the recent case *Tranum v. Broadway*, the Texas Court of Appeals applied the "specific intent" standard to a malicious prosecution claim.   283 S.W.3d 403 (Tex. App.—Waco 2008, no pet.).   In that case, the plaintiff was the former general manager of a car dealership who brought claims of slander and malicious prosecution against the dealer's owner.   After the dealership began to experience cash flow problems, leading to the plaintiff's resignation, the defendant told others in the community that the dealership's financial problems were caused by the plaintiff's accounting manipulations. The plaintiff then sued defendant for libel.   The defendant responded by contacting the district attorney's office, which filed an indictment against the plaintiff, accusing him of theft.   The defendant had told other witnesses that he wanted to "get' or "prosecute" the plaintiff.   When the grand jury returned with a "no bill" the plaintiff amended his suit against the defendant to add a claim for malicious prosecution.

While the jury was also instructed with the pre-2003 definition of malice, the plaintiff relied on the first prong, arguing that the defendant acted with "the specific intent to cause substantial harm."   Based on the testimony presented at trial, the Texas Court of Appeals found that there was enough evidence to support the jury's finding that the defendant acted with a "specific intent" to cause the plaintiff "substantial injury or harm."   It concluded that "truth of whether [the plaintiff] had committed the criminal acts with which he was accused was uniquely within [the defendant's] knowledge. Although he knew they were false, the defendant spread his accusations about the plaintiff throughout the community, including to the district attorney. *Tranum*, 283 S.W.3d at 424. As a result, the plaintiff had suffered harm to his reputation and had been subject to a criminal prosecution.

In the instant case, the Court finds that Plaintiffs presented sufficient evidence for the jury to reasonably form a firm belief or conviction that Defendants acted with a specific intent to cause substantial injury or harm to Hudson and Jordan. In the post-trial briefing, Plaintiffs draw the Court's attention to the testimony of Agent Presley of the Texas Rangers, an admittedly neutral party, who investigated whether Defendants had committed official oppression by filing charges against Plaintiffs.

Here, the jury heard evidence from Agent Presley of the Texas Rangers, an admittedly neutral party, who investigated Defendants for official oppression. Presley was asked to investigate Ford and Seals' complaint to the Harris County District Attorney's office alleging that Hudson and Jordan committed identity theft. Presley told the jury that TSU had conducted two investigations of Plaintiffs: the first was carried out by Officer Eagleton. Hudson and Jordan reported to Eagleton that they had found the financial documents in the dump truck. Eagleton went to the site to investigate their report and brought some of the documents back to his office. He met with his Captain and Chief Young, and they concluded that there was insufficient evidence for criminal charges. (Tr., vol. VIII, 89:15-90:3, July 30, 2008.) Eagleton wrote a report, found that there was "no criminal intent" and the case was closed. (Tr., vol. VII, 139:20-24, July 29, 2008.)

Presley concluded that the second investigation was kicked off because "one of the boys had an argument with Wiggins." (Tr., vol. VII, 101:23-25.) Presley testified that, while Wiggins was TSU's Chief Financial Officer, and not in the chain of command at the campus police department, he was able to contact ranking officers in the TSU police department in order to "push the investigation forward." (*Id.* at 102:1-3.) Wiggins

15

contacted Falls, who at the time was Assistant Vice President for Human Resources and Public Safety, who then contacted Captain Seals in the TSU campus police department. (*Id.* at 102:14-18; Tr., vol. VII, 60:17-18.) Falls emailed Chief James Young, head of the campus police department, and told him that he needed to assign a "senior officer" to investigate the Jew Don Boney flyer because the "administration," including Falls and Wiggins, considered it identity theft. (Tr., vol. VII, 138:1-22.)   In the email, Falls informed Young that "I understand that Deidra Davis and J. Don Boney are planning to come to DPS and file charges against our student activists.  Should they do [sic], because of the high sensitivity and importance of this case to the university, please assign Captain Seals." (*Id.* at 69:10-15.)  Young was typically responsible for assigning investigators to cases, and this was the only instance where Falls instructed him who should work on an investigation.  (*Id.* at 78:12-25.)  Seals asked that Ford be allowed to assist him with the investigation.  (*Id.* at 147:22-148:2.)  Young then attended a meeting that included Falls, Ford, and Wiggins, in which he and Gita Bolt, from the Office of the General Counsel, informed Defendants that there was not enough evidence to pursue criminal charges against Hudson and Jordan.   Wiggins disagreed and said he believed their actions constituted identity theft. (*Id.* at 144:25-146:1.)

The night of March 2, Ford informed an ADA, over the phone, that Hudson and Jordan had "hacked into a computer" when, according to Presley, "that wasn't the case, and [Defendants] knew it wasn't the case." (Tr., vol. VIII, 107:10-17.) When Ford later filed the probable cause affidavit, she omitted the word "hacking," which inconsistency sparked Presley's investigation.  (*Id.* at 109-11.)  Chief Young learned only after coming into work the next day that charges had been filed against Hudson and Jordan.  (*Id.* at

16

94:16-25.) Young confronted Ford and Seals, asking what grounds they had for filing charges, because there was not enough evidence. (Tr., vol. VII, 159:13-19.) Ford told him that she called the District Attorney, explained the situation, and they accepted the charges as identity theft. (*Id.* at 159:20-25.) Wiggins then told Young "that they finally got something done that he couldn't get done." (Tr., vol. VIII, 95:1-3.) Approximately three to four days later, Falls called Young to his office and told him that the university was going "in a different direction" and that they no longer needed his services. (Tr., vol. VII, 160:22-161:4.)

Presley learned from Interim Police Chief Debra Richardson that there was a relationship between Ford and Wiggins. (Tr., vol. VIII, 104:-106.) Presley told the jury that he had also learned, through past investigations, that through Ford's association with Wiggins, she was able to "manipulate certain goings on around the police department." (*Id.* at 103:7-10.) Chief Young could not control Ford without facing hostility and retaliation from Wiggins. (*Id.* at 103:12-16.) Because of this personal relationship, Presley concluded that Defendants disregarded their oath of office, duties, and penal code. (*Id.* at 106:11-21.) Presley reflected that Falls, Ford, and Wiggins should have "received the facts as they were and not allowed it to become personal," particularly when Young and Bolt had told them in a meeting that charges should not be filed. (*Id.* at 106:22-107:3.) Presley concluded, after interviewing approximately 17 witnesses, that there had been no probable cause to pursue charges against Hudson and Jordan. (*Id.* at 90:19-91:5.) Presley testified that both Ford and Wiggins had refused to be interviewed for his investigation. (*Id.* at 91-92.)[8]

---

[8] Presley testified that his investigation ultimately did not result in charges against Ford, Falls, or Wiggins because Ford had omitted the word "hacking" from the probable cause affidavit. (Tr., vol. VII, 107:22-24.)

Considering the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that Wiggins, Falls, and Ford all had a specific intent to cause Hudson and Jordan substantial harm.  According to Presley, Wiggins manipulated his connections in the campus department to reopen the investigation against Hudson and Jordan after he had a confrontation with Plaintiffs.  Falls, who referred to Hudson and Jordan as "our student activists," bypassed the typical procedure for investigations by instructing Young that he assign Seals to the case.  Wiggins, Ford, and Falls were all told by both Young and Gita Bolt that there was not enough evidence to file criminal charges against Hudson and Jordan.  Nevertheless, Ford contacted the District Attorney's office and informed an Assistant District Attorney that the Plaintiffs had obtained Boney's social security number through hacking.  Ford omitted this accusation when she filed the probable cause affidavit.  Shortly after Young confronted Ford and Seals for filing charges against Hudson and Jordan, Falls essentially terminated his employment at TSU.  This evidence supports the jury's conclusion that, through their manipulation of the TSU police department and misrepresentations to the district attorney's office, Wiggins, Falls, and Ford all specifically intended to cause Hudson and Jordan substantial injury.

## 2. First Amendment Claims

As to Plaintiff's First Amendment claims, punitive damages may be awarded only when the defendant's conduct is either "motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights." *Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003) (internal citations and quotations omitted).  "The [callous indifference] standard requires recklessness in its subjective form, i.e., a subjective consciousness of a risk or injury or illegality and a criminal indifference to

civil obligations." *Id.* (internal quotations omitted). In *Williams*, the Fifth Circuit found that the defendant police officer's behavior constituted "reckless indifference" to the plaintiff's constitutional rights when the officer ignored the limited scope of a search warrant. *Id.* The First Circuit has commented that, in retaliation cases, "[w]here the defendant engages in particularly 'outrageous' acts of retaliation and where the right whose exercise triggers those retaliatory acts is a well-established constitutional right, a factfinder 'could, but need not, fairly infer that the [defendant] harbored malice or reckless indifference' towards that federal right." *Powell v. Alexander*, 391 F.3d 1, 19 (1st Cir. 2004) (citing *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 42 (1st Cir. 2003)). "Although the specific intent to violate a plaintiff's federally protected right will support a punitive damages award, 'reckless indifference' towards a plaintiff's federally protected right also suffices to authorize liability for punitive damages under § 1983." *Id.*

### a) Brown's Claims Against Marshall and Wiggins

The jury ordered Marshall and Wiggins to each pay Brown $50,000 as compensation for violating his First Amendment rights. During the punitive damages phase of the trial, and in the post-trial briefing, Brown argues that Marshall manipulated the student disciplinary process to punish Brown for his constitutionally protected activities. At the time of the incidents in question, Marshall was the Associate Provost for Student Services and Dean of Students. (Tr., vol. VI, 99:13-14, July 29, 2008.) Part of his duties included overseeing the Judicial Affairs Department, which handled student complaints and concerns as well as student discipline. (*Id.* at 100:20-25.)

Brown's disciplinary hearing, which was related to a confrontation with another student, Greg Taylor, was initially scheduled for February 17, 2005. When Brown

arrived for the scheduled hearing, Dean Thomas, who reports to Marshall, told Brown that the hearing had been dropped because the other student had found the item Brown allegedly stole. (Tr., vol. II, 182:13-18, July 22, 2008.)

Marshall had discussed two incidents with Brown that occurred in early March, Brown's confrontation with his French teacher and his dispute with the head of the TSU English Department.  In both of those conversations, Marshall advised Brown not to interfere with professors.  (Tr., vol. II, 14:5-12; 32:16-25.) At one point, Marshall contacted Brown and told him that the matter with the head of the English Department had been "resolved." (*Id.* at 33:12-17.)  Brown then learned that there was a disciplinary hearing scheduled for March 10, 2005, on these matters and the incident with Taylor, all of which Brown thought had been resolved.  After that hearing, Marshall sent Brown a letter, dated March 10, 2005, that placed him on "strict disciplinary probation," which required him to have a police escort whenever he was on campus and to give up his activities in the student government.  (*Id.* at 8:7-25; 42:11-12.)  Brown opined that his previous disciplinary issues had been revived once he increased his political activity on campus and in Austin.  At trial, Marshall could not explain why it took six weeks to process the original disciplinary complaint against Brown when the normal processing time is 72 hours.  (Tr., vol. VI, 135:13-25.)  Brown filed a counter-complaint against Taylor for accusing him of theft, but this counter-compliant was never acted upon and Taylor did not have to undergo a disciplinary hearing.  At trial, Marshall could not explain why this claim was not processed.

Marshall signed off on the terms of Brown's probationary contract, which required Brown to be accompanied by a police escort whenever he was on campus and

prevented him from having further involvement in the student government. (Tr., vol. II, 41:7-9.) Marshall also prevented Brown from appealing his probationary status even though Jordan, who allegedly had connections with Dr. Paul Johnson, the academic provost and Marshall's superior, was allowed to appeal his probationary status. (*Id.* at 44:17-25; Tr., vol. VI, 178:17-25.)

The Court finds that, drawing all inferences in favor of the verdict, there was sufficient evidence for a reasonable jury to conclude that Marshall acted with reckless indifference to Brown's constitutional rights. The evidence indicates that, as Brown became more politically active, Marshall administered the disciplinary process in an arbitrary manner in order to punish and silence Brown. *See Springer v. Henry*, 435 F.2d 268, 282 (3rd Cir. 2006) (upholding a punitive damages award when the record indicated that the defendant, a director of state hospital, retaliated against and "singled out" the plaintiff, who had spoken out against the hospital's practices, by manipulating the process by which the plaintiff was to renew his contract). Taking all the evidence in the light most favorable to Brown, the original charges related to his dispute with Taylor were dropped and then resurrected. The counter-complaint that he filed was, without explanation, never processed, and unlike Jordan, Marshall did not allow Brown to appeal his probationary status. Marshall signed off on Brown's probationary contract which, among other things, limited his involvement in the student government.

Defendants argue that Marshall did not sit on the discipline committee that punished Brown, which means he could not have been responsible for Brown's actual punishment. The jury heard evidence, however, that Marshall was ultimately in charge of the disciplinary process, that he personally counseled Brown regarding some of the

incidents, and that he signed off on Brown's probationary contract.  Defendants also argue that the evidence reflects that Brown would have been punished regardless of his political activities; however, the jury found otherwise during the liability phase of the trial.

As to Wiggins, Brown did not argue, either in the punitive damages phase or in his post-trial briefing, that Wiggins acted with reckless indifference to his First Amendment rights. After reviewing the record, the Court finds that there is not sufficient evidence to support a punitive damages award against Wiggins with respect to Brown's First Amendment claims.

### b)  Hudson's Claims Against Marshall

In the punitive damages stage, Hudson argues that Marshall was recklessly indifferent to his First Amendment rights when he encouraged Jew Don Boney to file charges against Hudson with the campus police for identity theft.  After reviewing the record, the Court does not believe that there is sufficient evidence to support Hudson's charge that Marshall encouraged Boney to file charges against Hudson.  Marshall denied ever speaking with Boney until after he had written his letter requesting that Hudson be disciplined for the alleged identity theft.  (Tr., vol. VI, 194-195.) Hudson offered no contrary evidence.

Furthermore, as to the restrictions Marshall placed on Hudson's participation in the graduation ceremony, Marshall gave uncontroverted testimony that these restrictions would have been imposed on any student who was suspended.  (*Id.* at 255:11-13.)  There was no evidence that these disciplinary measures, while harsh, were arbitrary or specifically targeted at Hudson's political activity.  The Court therefore finds that there is

not sufficient evidence to support the jury's punitive damages finding against Marshall with respect to Hudson's First Amendment claims.

### c) Hudson's Claims Against Wiggins, Falls, and Ford

The jury also ordered Wiggins, Falls, and Ford to pay Hudson punitive damages for their violation of his First Amendment rights. Without considering the evidentiary basis for these damages, the Court notes that, as reflected in Plaintiffs' argument during the punitive phase, the factual predicate for these damages was identical to that for Hudson's state law claims. It is well settled that a plaintiff cannot recover the same damages twice, even though the recovery is based on two different theories. *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987). Because the Court is concerned that the jury's award of punitive damages for Hudson's First Amendment claims was duplicative of the punitive damages he received for his state law claims, the Court will remit these damages.

### H. Unanimity of the Punitive Damages Verdict

Finally, Defendants contend that a new trial should be granted because the punitive damages verdict was not unanimous due to the "missing juror." Between the liability and punitive phases of the trial, one juror contacted the Court and expressed her displeasure at serving during the punitive phase. The juror informed the Court that the trial had lasted longer than predicted and that she had a vacation planned which would be impossible to reschedule. The Court therefore released the juror and proceeded to the punitive phase with eleven members of the original jury.

Defendants argue that, under Texas law, the same jury that hears the liability phase of the case must also hear the punitive damages phase of the case. Defendants

23

assert that "Texas law requires that the same 12 [jurors] consider punitive damages." Plaintiff responds that Defendants have misconstrued Texas law.

As an initial matter, while Defendants raised this argument in an objection before the punitive damages phase (Doc. No. 130), it was not contained in their Rule 50(a) Motion and is therefore waived. Defendants cite Section 41.003(d) of the Texas Civil Practice & Remedies Code, which states:

> Exemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages.

The law does not say that the same jury, in its entirety, that heard the case in the liability phase must unanimously decide the issue of punitive damages.  The case law Defendants cite does not address situations where the trial judge released a juror. *See Transporation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1994); *In re Bradle*, 83 S.W.3d 923, 926 (Tex. App.—Austin 2002, orig. proceeding).[9]

### III.    Conclusion

It is never easy to impose damages against an institution of higher learning or its officers and employees.  Nonetheless, there was ample evidence in the record from which the jury could find that Plaintiffs were the subject of disparate and unfair treatment

---

[9] In *In Re Bradle*, the Texas Court of Appeals found that when the trial court released the original jury that heard the liability phase and impaneled an entirely new jury to hear the punitive phase, the defendant's due process rights had been violated on two different grounds.  83 S.W.3d at 927.  First, it violated defendant's right to have the evidence heard by the jury lawfully chosen and impaneled to try the case. *Id.* at 928.  In the instant case, the members of the jury who heard the evidence in the punitive phase had been lawfully chosen by both parties during the voir dire proceeding the liability phase and then impaneled by the Court. The second violation of the defendant's rights found by the *Bradle* Court was based on the Supreme Court's decision in *BMW of N. Am. V. Gore*, 517 U.S. at 568.  The *Bradle* Court held that, if the punitive damages issue was tried and determined in isolation from the liability issues, the punitive damages verdict could be disproportionately greater than the gravity and severity of the misconduct at issue and the injury sustained. *Id.* "In Texas, proportionality is achieved by having punitive damages assessed based on a totality of the evidence from both phases of the bifurcated trial." *Id.* (citing *Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000).  Here, every juror who heard the evidence at the punitive phase had also heard the evidence presented during the liability phase and participated in the adjudication of the liability issues. There is no risk, therefore, that the jury's verdict was disproportionate because was not aware of the gravity and severity of the misconduct at issue and Plaintiffs' injuries.

because of their activism, and because of their ideology, which was viewed as Republican or, at the least, inconsistent with the prevailing ideology on campus. For these reasons, the Court finds that Defendants' Motion is **GRANTED** in part. The Court will remit the punitive damages awarded for Hudson's First Amendment claim against Marshall, Wiggins, Ford and Falls, and Brown's First Amendment claim against Wiggins. Defendants' Motion is **DENIED** as to the punitive damages awarded for Brown's First Amendment claim against Marshall and Hudson and Jordan's state law claims. The parties should confer and submit an agreed upon final judgment within ten days.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the ___11th___ day of September, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**